## In The United States District Court
## For the Eastern District of Pennsylvania

| | | |
|---|---|---|
| **Mulch Blower Express, LLC** | : | Civil Action |
| | : | |
| v. | : | # 09-03994(LDD) |
| **Doug Poppalardo, et al.** | : | |

### *AMENDED* COMPLAINT

1. Plaintiff is Mulch Blower Express, LLC, a Pennsylvania Limited Liability Company with a principal place of business at 67 Buck Road, B-23, Huntingdon Valley, Bucks County Pennsylvania.

2. Plaintiff was organized solely for the acquisition described below, as Defendants knew.

3. A Defendant is Douglas Poppalardo ("Doug") is a competent adult at all relevant times residing and doing business principally at 702 Bentley Court, Moorestown, N.J.

4. A Defendant is Sharleen Poppalardo ("Sharleen"), wife of Doug, is a competent adult at all relevant times residing and doing business principally at 702 Bentley Court, Moorestown, N.J.

5. A Defendant is Biome LLC, a foreign entity operating at 702 Bentley Court, Moorestown, N.J.

6. A Defendant is J.P. Homer LLC, ("Homer"), a foreign entity operating from 702 Bentley Court, Moorestown, N.J.

7. A Defendant is Turf Services Express LLC ("Turf"), a foreign entity operating from 702 Bentley Court, Moorestown, N.J.

8. A Defendant is Nature's Journey LLC ("Nature"), a foreign entity operating from 702 Bentley Court, Moorestown, N.J.

9. A Defendant is Jacqueline Poppalardo ("Jacki") a competent adult residing at 112 Pelham Road, Voorhees, New Jersey; she, Doug, and Sharleen are the "Poppolardo Defendants ".

10. A Defendant is Moorestown Green Holdings LLP ("Greene"), a foreign entity of undetermined constituents; but believed to now and/or before include Doug and/or his affiliates, operating from 702 Bentley Court, Moorestown, N. J.

11. A Defendant is Charles J. Block, a competent adult with an unknown residence whose principal place of business at 1233 Haddonfield Berlin Road, Suite 4, Voorhees, N.J.

12. A Defendant is Benjamin Ross Group LLC t/a Benjamin Ross Group ("BRG"), a domestic Limited Liability Company with a principal office in Bucks County, at 928 Jaymor Road, Suite A-150, Southampton, (Bucks County), Pennsylvania.

13. A Defendant is Michael Myers ("MM"), a competent adult with a principal place of business at his employer's office per the preceding Article.

14. A Defendant is Mulch Blower Express Limited Liability Company ("MBE NJ"), a New Jersey Limited Liability Company.

15. MBE NJ is a foreign entity that traded and did business, at 702 Bentley Court, Moorestown, New Jersey, using the Mulch Buyer Express name.

16. MBE NJ lacked Certificate of Authority in Pennsylvania (the primary state it operated or operates in).

17. MBE NJ lacked registration to use the name Mulch Buyer Express in Pennsylvania.

18. MBE NJ lacked registration to use the name Mulch Buyer Express in New Jersey.

19. Doug and affiliates used the name Mulch Buyer Express for multiple entities.

20. At no time since inception of any Defendant was the name Mulch Buyer Express ever registered to it.

21. At no time since inception of any Defendant did it or could it lawfully use, or authorize use of, the name Mulch Buyer Express.

22. No entity, before the closing with Plaintiff as below, registered to do business in Pennsylvania.

23. Biome **never** operated any mulch blowing business.

24. Biome operations were **only** asset sale transactions.

25. Biome operations were initiated and abetted by fraud in Pennsylvania.

26. Biome fraud was intentionally carried out in multiple and substantial ways,

27. Biome anticipated its Fraud to be carried out in Pennsylvania.

28. Biome knew in advance that consequences of its fraud would harm Plaintiff and its assignees.

29. Biome knew in advance that consequences of its fraud would cause such harm in Bucks County.

30. Co-Defendants knew and/or should have known of all material aspects of the preceding facts.

31. Biome operated or purported to operate only in Pennsylvania and somewhat in New Jersey.

32. Biome was never registered to operate or trade as Mulch Blower Express.

33. Doug established Biome in Delaware as an asset protection and fraud perpetration mechanism.

[*Remand Motion* **EXHIBIT A**]

34. Biome had no place of business or operations in Delaware.

35. Plaintiff is assignee of Michael Leneghan ("Mike") and Scott Weiss ("Scott").

36. Mike and Scott are 2 competent adults, the sole Members of Plaintiff.

37. Mike and Scott in Bucks County were induced to fraudulently enter into agreements, and received misrepresentations, at the core of this dispute.

38. BRG solicited Scott Weiss by e-mail with this offer in **late 2008 (relating to the instant Mulch Blower Express sale ("MBE")**.

*Type of business: Business to Business Service Co.*
*Location    Burlington County, NJ*
*Price          Down Payment          Cash Flow          Gross Revenue*
                 *$62,000*                    *$62,000*              *$488,000*

*A business to business service company has come on the market. Most of their business comes from repeat customers and word of mouth. Their service is currently booked a year in advance. This profitable company has been pre-approved for an SBA (Small Business Administration) loan for a qualified buyer with a down payment of $62,000. The new owner would make $220,000 in the first year after debt service, thereby recovering the down payment in less than 4 months. We obtain SBA loans in about 2 weeks with very little paperwork.*

39. BRG was the sole broker for sale of "Mulch Blower Express".

40. BRG brokered Mulch Blower Express sale in calendar years 2007-2008 ("Marketing Period").

41. BRG supplied promotional materials ("Promo") following response to the "Solicitation".

42. A copy of the Promo is attached as Exhibit **"A"**.

43. No one operated MBE NJ in 2008.

44. No one operated "Mulch Blower Express" in 2008.

45. **The MBE NJ charter was suspended, then revoked in April 2008, and remains so.**

46. During the Marketing Period, there were 3 accepted offers (each "Offer"); 2 led to sales.

47. The first Offer ("Offer 1"), involved Steven Hinkerdly; ("SH") it was accepted in 2007.

48. Offer 1 closed at the very beginning of 2008.

49. The second Offer ("Offer 2") involved Ron Paul ("RP") and was made November 2008.

50. The third ("Offer 3") involved Plaintiff and is central to this lawsuit.

51. Offer 2 was accepted November 2008, with a $30,000 deposit; Offer 3 was accepted December 2008, with a $30,000 deposit.

52. Offer 2 remained pending before and upon Solicitation; Plaintiff through counsel first **learned of it August 2009.**

53. MM was the lead salesman at BRG on marketing sale of Mulch Blower Express ("MBE") throughout the Marketing Period;

54. MM handled all Offers for MBE, as BRG and MBE agent/with their approval and authority.

55. MM handled other inquiries (details not verified yet), as agent for BRG and MBE).

56. BMG via MM had notice before the Offers of multiple improprieties involving MBE/its sale.

57. Detailed in the Affidavit of Mike and Scott filed concurrently ("Affidavit").

58. Affidavit allegations are incorporated by reference but not detailed or documented in this Complaint ("Complaint").

59. Affidavit materials, being evidentiary and in some cases surplusage, are not attached.

60. Offer 1 was closed with Seller commission fees paid direct at closing by SH.

61. Offer 3 was closed with Seller commission fees paid direct before closing by Mike and Scott.

62. No Offer was made by anyone with knowledge of any material relevant detail in the Affidavit.

63. The Promo contained the only documents MBE would provide and/or verify to Plaintiff; SH received no tax returns but only cash flow projections and Quickbooks data for MBE NJ.

64. The Promo financial documents ("Financials) show MBE NJ was owner of the MBE in 2006.

65. The Promo financial documents ("Financials) show MBE NJ was owner of the MBE in 2007.

66. Doug tried his best to keep knowledge of an Offer from a later Offer maker.

67. BMG prepared Offers 1 and 3 (on its letterhead); it is unknown but inferred as well Offer 2.

68. No Offer contained any attorney input for a purchaser; each was signed as presented by BRG.

69. No prior Offer was disclosed to a later prospect unless discovered and forced.

70. No prior Offer was disclosed to a later prospect unless discovered and forced.

71. Doug had every other offer maker sign a non-disclosure agreement ("NDA").

72. The NDA precludes further proof of basis for allegations than as set forth or incorporated here.

73. RP through counsel requires a court order to reveal and/or release Offer 2 detail or proof.

74. Offer 1 closing was altered by Doug and/or Block to appear as if closed in 2007.

75. SH was induced to Offer 1 by promotional material like Plaintiff received.

76. SH was told before closing, and never otherwise, that Doug owned and operated MBE.

77. RP was told before closing, and never otherwise, that Doug owned and operated MBE.

78. Mike was told before closing, and never otherwise, that Doug owned and operated MBE.

79. SH, Doug and Block closed Offer 1 at Block's office.

79. Obscured when Offer 1 closed was that MBE received no payment.

80. Per Doug instructions, Offer 1 closed with all proceeds issued in bank checks but none to MBE.

81. Per Doug instructions, $15,OOO of Offer 1 proceeds went to Greene.

82. Per Doug instructions, $ 265,OOO of Offer 1 proceeds went to Block; none was earmarked.

83. Payment other than to MBE was never explained to SH, to minimize his lack of recourse.

84. MBE lacked legal authority to execute any agreement or enter into any transaction or transaction agreement involving any asset, after April 2008.

85. Just before closing Offer 1, Doug required and SH agreed by Rider with MBE NJ to allocate Vehicles value at $200,000; 1/2 of the $400,000 purchase price.

86. Shortly after closing, SH discovered he had been deceived from the start about MBE.

85. Deception of SH about MBE was fundamental and intended for reliance by SH.

86. Deception of SH about MBE involved every material aspect of its operation.

87. Deception of SH about MBE included source and amount of operation revenues generated.

88. Deception of SH about MBE included purpose and amount of expenses, such as improving Doug and Sharleen's real estate (now hers only by title).

89. Deception of SH about MBE and/or its principals included multi-hundred thousand dollar **delinquent and liened back U.S. Trust taxes.**

90. Deception of SH about MBE included multi-hundred thousand dollar trade debts and personnel claims, some later partly paid; but the largest ones exceeding $100,000 are not resolved.

91. Plaintiff and RP were similarly deceived as SH above,

92. MBE was sold to SH, for $400,000 ($300,000 down).

93. MBE had no assets except ones it retained to sell SH, P or Plaintiff.

94. Vehicles supposedly sold to SH per Offer 1 were titled in the name of Jacki, not MBE.

95. MBE equipment (warranted to work) was and remained unworkable upon Offer 1 closing.

96. SH realized within a brief time after closing that the MBE operation was unprofitable.

97. SH realized within a brief period time after closing that MBE operation would be unprofitable.

98. SH realized within a brief time after Offer 1 closing that the MBE business plan was rigged.

99. SH realized within a brief time after Offer 1 closing that MBE would lose, not make, money.

100. SH realized within a brief time after Offer 1 closing that operating MBE would result in greater loss with time passing.

101. SH realized within a brief time after Offer 1 closing that operating MBE, ironically, would mean even greater loss if business increased.

102. Doug, when confronted after closing, tried to cover and suggested SH increase payroll.

103. Doug, when confronted after closing, tried to cover and suggested SH switch workers.

104. SH was previously experienced and successful in other businesses; and knew a total loss was inevitably and irreversibly coming.

105. Aside $300,00 for purchase, SH also had immediate insurance costs, repair costs just to rig Vehicles to work right, and a gross loss on transactions.

106. Within 3 weeks of closing, SH could find no way just to break even.

107. Doug sensed opportunity with SH desperate at being so sharply taken.

108. So Doug offered to have MBE buy back the MBE Assets

109. The so-called buyback did not involve MBE, but rather Biome.

110. The so-called buyback offered discharge of cancellation of a mortgage securing $100,000.

111. The mortgage by SH and his spouse supposedly secured payment of the MBE purchase money balance.

112. The so-called buyback debt was never discharged and remains extant.

113. MBE debt could not be cancelled by Biome.

114. Biome could not acquire the Vehicles from SH as they belonged to Jacki, not MBE.

115. Neither MBE nor any successor operated after 3/26/08, in fact after January 2008.

116. October 2008, BRG brokered Offer 2 with RP; using MBE plan/financials from the SH deal.

117. RP was alarmed after Offer 2 was accepted, because no 2008 MBE records were provided,

118. RP refused to go forward until 2008 records were available.

119. As a result of that RP refusal, Doug concocted a phony story.

120. Doug's story was that SH had a "nervous breakdown"; the business was repurchased.

121. RP wanted to verify the "nervous breakdown" by contacting SG.

122. RP was told it was not possible; still, SH was not named and no other information given.

123. RP then found personnel related discrepancies in MBE financials, and asked for explanation.

124. BRG forwarded RP a letter saying Doug claimed that MBE paid its personnel cash ("Letter").

125. The Letter was followed with refusal to provide **any** details about personnel pay or 20

126. RP was convinced after these revelations that the business was unsuitable, to say the least.

127. RP wanted his deposit back; so Doug set out to thwart that.

128. Doug under pretext claimed that RP took too long to complete due diligence without closing.

129. That pretext let him attempt to claim good faith right to terminate Offer 2 as RP breached.

130. RP was trapped with his $30,000 deposit apparently retained by (payee) BRG.

131. While Doug tied up RP, the Solicitation took place and Mike and Scott were targeted.

132. BRG and Doug were in regular contact with Mike and Scott in December 2008.

133. After Plaintiff's Offer, the 2008 financials problem resurfaced.

134. MBE had supposedly generated comparable financial figures in 2008 as before.

135. 2008 data was critical for evaluating December purchase of MBE ("Established in 2005").

136. Lack of 2008 data created problems with Offer 3, which Offer was induced by promotional material like SH received (apparently RP, and likely any other live prospect too).

137. Scott and Mike were told before closing, and never otherwise, that Doug owned and operated MBE.

138. Scott and Mike were told before closing, and never otherwise, that Doug owned and operated MBE.

139 Scott and Mike were told before closing, and never otherwise, that Doug owned and operated MBE.

140. Shortly after closing, Plaintiff discovered Scott and Mike had been deceived from the start about MBE.

141. Deception of Scott and Mike about MBE was just like that of SH above.

142. Before closing, Scott and Mike inquired about 2008 financials (only 2006 & 2007 financials were provided).

143. MM of BRG (and Doug) both explained it away by mention of an unnamed prior buyer who operated in 2008 and who/whose figures were unavailable.

144. Supposedly the prior buyer had a "nervous breakdown", and sold it back to MBE.

145. As with RP, identity, contact or details were falsely rebuffed.

146. Unlike RP, Scott and Mike were unaware pre-closing about the personnel cash problem.

147. Needing close access to $80,000 from closing December 2008, Doug strongly pressured Plaintiff to close Offer 3.

148. Pressure on plaintiff to close was applied by falsely stating that another interested buyer was eager to buy MBE, close quickly or miss the opportunity to the other interested buyer.

149. In fact the opportunity was never subject to loss.

150. Doug knew in November 2008 that Offer 2 (this month discovered by Plaintiff's counsel to be by RP) would not close due to problems noted above.

151. 2008 and personnel cash details, lies about SH, and other irregularities about MBE described in the Complaint, closely parallel those involving RP.

152. 2008 and personnel cash details, lies about SH, and other irregularities about MBE described in the Complaint closely parallel those involving RP.

153. After Plaintiff closed the MBE purchase it was determined that the Vehicles had been in the name of "Jacquelin Poppalardo" (a Jacki pseudonym).

154. July 2009 Plaintiff learned that the Vehicles it bought were sold to SH over a year prior, and to be sold to RP per Offer 2 almost concurrent with Offer 3 ; in like or worse condition, without any interim repair, maintenance or improvement of substance.

155. Plaintiff learned of SH by stroke of luck, finding his name on an old scrap of paper left behind.

156. Due to problems with a Vehicle, by stroke of luck a common source of information about Doug was discovered.

157. The above led to unraveling of the rest of the story.

158. Amongst the recent discoveries from SH are that replying to a Fall 2008 BRG inquiry, he told:

   A. BRG he had no nervous breakdown;

   B. BRG there was no reason to believe he had a breakdown

   C. BRG that Doug had taken him for more than he paid already, over $300,000 and the MB assets too.

   Accordingly, BRG supposedly declined to broker sale of MBE again.

159. BRG did not so decline but twice more in a month or 2 got Offers 2 and 3; and closed Offer 3.

160. Discovery of the SH deception led to Plaintiff discovery of the above; and of other liens and judgments against Doug, Sharleen, and MBE.

161. That led to discovery about RP, carefully hidden in a desperate but successful effort to reel in Plaintiff.

162. Through a series of yet unclear but interrelated transactions, concurrent with financial implosion he divested all real estate ownership but enjoys all benefits of it.

163. Doug uses a common linchpin in his many schemes, Homer (all shares currently owned and operated of record by Jacki and Sharleen , with Doug pulling the strings).

164. Use of the same mechanism for and deception about MBE revenues, expenses, productivity, and so forth made to sell MBE to SH, RP, and Plaintiff, all reflect a common scheme or artifice by to defraud Plaintiff (*inter alii*).

165. Doug required bank checks payable to **Block** to close each MBE purchase.

166. In closing Offer 3, all $80,000 was paid to Block.

167. MBE, Doug, Sharleen and their affiliates are and were insolvent before Offer 1.

168. MBE, Doug, Sharleen and their affiliates are and have been insolvent since Offer 1.

169. Since 2005, Doug and Block, with the assistance and/or use of other, perpetrated a series of frauds involving MBE; the last discovered involving Plaintiff.

170. As early as could be traced so far, the enterprise that started the fraud(s) was Nature.

171. Circa 2005, Nature was owned, operated, and financed by or through a combination of Doug and other Defendants.

172. Doug, Sharleen, and Nature's substantial financial difficulties by 2005 led to multiple litigation by institutional lenders, including several foreclosure actions left from a failed SBA loan, involving some Defendants and their putative place of business.

173. When Doug, Sharleen, and Nature encountered and/or faced risk of tax and other financial difficulties, their assets were shifted via Doug to protected locations.

174. There was no bona fide consideration for any MBE sale.

175. MBE sale was designed to launder, hide, safeguard from legal action, and/or strip companies that had debt of their assets for sale by new companies, benefiting Block and the Poppolardos.

176. Plaintiff acquired rights by assignment to pursue this action.

177. At all relevant times, the Poppolardo Defendants and Block acted in combination through a common scheme, plan and/or artifice, damaging Plaintiff as described below.

178. Every Defendant knew, whether actually involved, or if necessary reasonable candor/ investigation/discloure had occurred, at all times relevant hereto:

    A. Doug was a principal de jure and/or de facto, agent and/or representative of each entity Defendant.

    B. Sharleen was a principal de jure and/or de facto, agent, and/ or representative of each entity Defendant except BRG.

    C. Block was a principal de jure and/or de facto, agent, and/ or representative of each entity Defendant except BRG.

179. Every Defendant knew actually and/or constructively, that at all times relevant hereto:

    A. Doug was acting within the course and scope of authority to make and/or implement controlling decisions for each entity Defendant except BRG, as well as for each matter relevant hereto.

    B. Sharleen was acting within the course and scope of authority to make and/or

implement controlling decisions, for each entity Defendant except BRG, as well as for each matter relevant hereto.

 C. Block was acting within the course and scope of authority to make to make and/or implement controlling decisions for each entity Defendant except BRG, as well as for each matter relevant hereto.

 D. Sharleen was legally able to make controlling decisions, for entity Defendants except BRG, as well as for each matter relevant hereto.

 E. Doug was by consent of Sharleen legally able to make controlling decisions for each entity Defendant but BRG, as well as for each matter relevant hereto.

 F. The individual Defendants except MM acted in combination to exercise dominion and control over the affairs of various entity Defendants.

 G. Doug was indicted before Offer 3 for criminal conduct in disposition of property used in or relating to MBE, and is known to willfully and habitually disregard rights and rules of law as to proper disposition of property and the rights of others adversely affected.

180. The individual Defendants except MM acted in combination to intermingle operations of various entity Defendants.

181. The individual Defendants acted in combination to intermingle operations of various Defendants.

182. The individual Defendants acted in combination to intermingle operations of various entity Defendants.

183. All defendant entities except BRG shared common facilities

184. All defendant entities except BRG shared common control.

185. All defendant entities except BRG shared common ownership.

186. The Poppolardo Defendants and Block acted in combination to intermingle their finances with each other and those of the entity Defendants.

187. The Poppolardo Defendants acted in combination through shifted/disguised/shared facilities, personnel, customers, vendors, suppliers, contractors, lenders, resources and assets

188. The Poppolardo Defendants and Block acted in combination to facilitate the sale and resale of Poppalardo Defendants and/or entity Defendant assets.

189. Entity and Pappalardo Defendant efforts and resources were utilized to:

 A. strip or spin off assets during and/or or creating insolvency;

B. defraud numerous creditors, notably but by no means only, Plaintiff and the U.S.

190. Entity and Pappalardo Defendant efforts and resources utilized during or after such insolvency were meant to and left behind empty operating shells

191. Entity and Pappalardo Defendant efforts and resources utilized during or after such insolvency were meant to and did disguise revenue/expense trails of various entity Defendants and others.

192. The Poppolardo Defendants and Block acted in combination to facilitate with other of the former's other affiliates including Consulting LLC, Whitespring LLC, and/or Eenabled Pharmaceutical Services LLC.

194. Relevant evidence requires a Court Order for RP to divulge, according to his attorney, although that appears to be inaccurate except as to actual terms of a recent settlement purported.

195. The Poppolardo Defendants and Block acted in combination through a common scheme, plan and/or artifice, damaging Plaintiff by loss of all funds paid or assets generated in purchase of MBE.

196. Principal loss in the purchase was $110,000 plus partial payment on the balance and unlawful repossession and sale of one Vehicle valued by Doug at as much as $100,00; and liquidated in unknown fashion for $38,000

197. At all times relevant hereto Doug was a principal de jure and/or de facto, agent, and/or representative of each entity Defendant except BRG.

198. At all times relevant hereto, Sharleen was a principal de jure and/or de facto, agent,and/or representative of each entity Defendant except BRG.

199. At all times relevant hereto Block was a principal de facto, agent, and/ or representative of each entity Defendant.

200. At all times relevant hereto, Doug was acting within the course and scope of authority to make controlling decisions for each entity Defendant except BRG, as well as for each matter relevant hereto.

201. At all times relevant hereto, Sharleen was acting within the course and scope of authority to make controlling decisions for each entity Defendant except BRG, as well as for each matter relevant hereto.

202. At all times relevant hereto, Sharleen was legally able to make controlling decisions for each entity Defendant except BRG, as well as for each matter relevant hereto.

203. At all times relevant hereto, Doug was by consent of Sharleen legally able to make controlling decisions for entity Defendants, as well as for each matter relevant hereto; and vice versa.

204. At all relevant times, the Poppalardo Defendants and Block acted in combination to exercise dominion and control over the affairs of various entity Defendants except BRG.

205. At all relevant times, the individual Defendants acted in combination to intermingle operations of various entity Defendants.

206. At all relevant times, the Poppalardo Defendants and related entities acted in combination through cash and barter.

207. At all relevant times, the Poppalardo Defendants and related entities acted in combination to shift/disguise/share various facilities, personnel, customers, vendors, suppliers, contractors, lenders, resources and assets, to defraud creditors and enrich themselves..

208. At all relevant times, the Poppolardo Defendants and Block acted in combination to facilitate the fraudulent sale and resale of MBE Assets.

209. At all relevant times, MM was an authorized agent or representative for BRG (acting in the course and within the scope thereof).

210. Conduct of activities related to MBE/the other Poppalardo Defendant companies include a **current** operation, Turf.

212. Doug violated Offer 3 terms and personal agreement not to compete as below.

213. Doug unjustly interfered with contractual relations, to overtly solicit and receive (disguised as requested) about $50,000 for competitive work from Brickman Group Ltd. in 2008

214. Plaintiff's purchase agreement (copy attached as Exhibit "B") prohibits such conduct.

215. Doug for the Poppalrado Defendants did so willfully, and never intended to abide Exhibit B.

216. Brickman Group Ltd. was the only customer of MBE that supposedly generated revenues of the type representative per the Financials and Doug's representations.

## COUNT I

217. Plaintiffs incorporate by reference all preceding allegations.

218. Plaintiff is entitled to rescission of Offer 1, and its closing.

219. Plaintiff is entitled to restitution in the amount of its damage as above.

220. Plaintiff is entitled to cancellation of the purchase balance and securing note.

WHEREFORE, Plaintiff demands rescission, restitution, cancellation of the purchase balance and securing note, as above, with lawful interest and costs.

## COUNT II

221. Plaintiffs incorporate by reference all preceding allegations.

222. Plaintiff is entitled to punitive damages from each Defendant, jointly and severally.

223. Plaintiff is entitled, failing full financial relief per Count I, to compensatory damages equal to the amount of restitution sought

WHEREFORE, plaintiff demands judgment against Defendants, jointly and severally for an unliquidated amount, plus lawful interest and costs.

## COUNT III

224. Plaintiff incorporates by reference all preceding allegations.

225. Defendants conspired with each other to the detriment of Plaintiffs as aforesaid.

226. Defendants committed a civil conspiracy resulting in the damages described above (hereby incorporated by reference).

WHEREFORE, plaintiff demands judgment against defendants jointly and severally for compensatory and punitive damages in an unliquidated amount, plus lawful interest and costs.

## COUNT IV

227. Plaintiffs incorporate by reference all preceding allegations.

228. Warranties and terms of Offer 3 and closing documents were breached by MBE and Biome, by virtue of the preceding.

229. Damages to Plaintiff from such breach were caused, exceeding the $110,000 paid through closing.

230. Damages to Plaintiff from such breach were attributable to cooperating Defendants.

WHEREFORE, plaintiff demands judgment against defendants jointly and severally for an unliquidated amount, plus lawful interest and costs.

## COUNT V

231. Plaintiff incorporates by reference all preceding allegations.

232. Biome had no right to repossess or sell a Vehicle Plaintiff acquired by contract from it.

233. Biome did it anyway as acknowledged by belated notice after its resale, sent and carried out directly by Doug and Block.

234. Biome applied proceeds from sale of the repossessed Vehicle wrongfully, to Poppalardo Defendants' benefit.

235. Plaintiff is entitled to fair market value for loss of the Vehicle.

236. $100,000 is fair market value of the repossessed vehicle per the SH deal.

237. The above constitutes conversion, theft, and or wrongful taking ("Conversion").

238. Loss of use damages are also recoverable for the Conversion.

239. Punitive Damages are also recoverable for the Conversion.

 WHEREFORE, plaintiff demands judgment against defendants jointly and severally for an unliquidated amount, plus lawful interest and costs.

## COUNT VII

240. Plaintiffs incorporate by reference all preceding allegations.

241. If the foregoing does not entitle Plaintiff to the full relief sought, then Defendants would be unjustly enriched at Plaintiff expense for in excess of $148,000, the exact amount unliquidated.

 WHEREFORE, plaintiff demands judgment against defendants jointly and severally for an unliquidated amount, plus lawful interest and costs.

## COUNT VII

242. Plaintiffs incorporate by reference all preceding allegations.

243. Plaintiff would suffer irreparable harm as specified in the concurrently filed Petition for Preliminary Injunction (incorporated by reference).

244. Plaintiff is entitled to enjoin any collection or enforcement action taken by Defendants against it or Mike and Scott as assignors.

245. Equity justifies and requires such an injunction, for reasons specified in the concurrently filed Petition for Preliminary Injunction (incorporated by reference).

 WHEREFORE, plaintiff demands judgment against defendants jointly and severally for an unliquidated amount, plus lawful interest and costs.

                _____
                ELLIOT MARK OLEN, ESQUIRE
                Attorney for **Plaintiff**

Oxford Crossing, Suite 302
333 Oxford Valley Road
Fairless Hills, Pa. 19030
Telephone: (215) 943-5343
Facsimile: (215) 943-5118
E-mail: olenlaw@comcast.net

z/md/clients/active/MulchblowerExpressLLC:MOTION4Remand11